[No. S087893. June 25, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
EJAAN DUPREE McCOY et al., Defendants and Appellants.

**COUNSEL**

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant Ejaan Dupree McCoy.

David McNeil Morse, under appointment by the Supreme Court, for Defendant and Appellant Derrick Lakey.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson, Stan Cross and Brian G. Smiley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—We granted review to decide whether an aider and abettor may be guilty of greater homicide-related offenses than those the actual perpetrator committed. Because defenses or extenuating circumstances may exist that are personal to the actual perpetrator and do not apply to the aider and abettor, the answer, sometimes, is yes. We reverse the judgment of the Court of Appeal, which concluded otherwise.

## I. FACTUAL AND PROCEDURAL HISTORY

Codefendants Ejaan Dupree McCoy and Derrick Lakey were tried together and convicted of crimes arising out of a drive-by shooting in Stockton in 1995. McCoy drove the car and Lakey was in the front passenger seat, with others in the back. The car approached four people standing on a street corner. McCoy leaned out of the window and shouted something. A flurry of shots was fired from the car toward the group. Witnesses saw both McCoy and Lakey shooting handguns. Two of the group were shot, one fatally. The other two escaped injury. Someone from outside the car returned fire, wounding Lakey. The evidence showed that McCoy fired the fatal bullets.

At trial, McCoy but not Lakey testified. McCoy admitted shooting but claimed he did so because he believed he would be shot himself. He said that earlier that day, he had driven by that same intersection, and someone fired shots in his direction. He decided to seek out a friend who might be able to help him determine who had fired at him. McCoy brought his gun for protection and picked up Lakey, who also had a gun. Across the street from his friend's house, McCoy saw three men standing near a tree. Thinking that one of them might be his friend, McCoy drove slowly toward the group, stopped, and called out to get their attention. McCoy then saw that the man was not his friend and that he held a "dark something" that appeared to be a gun. Believing that the man was going to shoot him, McCoy grabbed his own gun and fired until the gun was empty. Lakey also fired his gun out the car window.

A jury found McCoy and Lakey guilty of various crimes, including first degree murder and two counts of attempted murder. The Court of Appeal unanimously reversed McCoy's murder and attempted murder convictions, finding that the trial court prejudicially misinstructed the jury on McCoy's theory of unreasonable self-defense, a theory that, if the jury had accepted it, would have reduced the crimes to voluntary manslaughter and attempted voluntary manslaughter. (See generally *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88 [96 Cal.Rptr.2d 451, 999 P.2d 675].)

The Court of Appeal also reversed Lakey's murder and attempted murder convictions "for two independent reasons: (1) under California law, a defendant who is tried as an aider and abettor cannot be convicted of an offense greater than that of which the actual perpetrator is convicted, where the aider and abettor and the perpetrator are tried in the same trial upon the same evidence, and (2) on this record, we cannot conclude with reasonable certainty that any participant acted with malice in connection with [the murder and attempted murder counts], so we cannot say that the crimes of

murder or attempted murder have been committed." Justice Hull dissented as to Lakey and would have affirmed his conviction.

We granted the Attorney General's petition for review limited to whether the Court of Appeal correctly reversed Lakey's murder and attempted murder convictions.

## II. Discussion

If a person kills or attempts to kill in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter or attempted voluntary manslaughter, not murder or attempted murder. (*People v. Blakeley, supra,* 23 Cal.4th at pp. 87-88.) McCoy's testimony provided evidence that he acted in unreasonable self-defense, so the trial court instructed on that theory. The Court of Appeal reversed McCoy's murder and attempted murder convictions because it concluded the court's instructions on unreasonable self-defense were prejudicially erroneous. We did not grant review on that issue, so we accept the Court of Appeal's conclusion as to McCoy. (*People v. Weiss* (1999) 20 Cal.4th 1073, 1076-1077 [86 Cal.Rptr.2d 337, 978 P.2d 1257].) Thus, it is possible that on retrial McCoy will be found guilty of manslaughter and attempted voluntary manslaughter rather than murder and attempted murder.

The question before us is whether reversal of McCoy's convictions also requires reversal of Lakey's. The Court of Appeal divided on the question. The majority found that McCoy, whose gun fired the fatal bullets, was guilty as the direct perpetrator and Lakey as an aider and abettor. It interpreted certain cases to mean that an aider and abettor may not be guilty of a greater offense than the direct perpetrator and concluded therefore that if McCoy was guilty of crimes less than murder or attempted murder, then Lakey also could only be guilty of those lesser crimes. (Citing *People v. Antick* (1975) 15 Cal.3d 79, 89 [123 Cal.Rptr. 475, 539 P.2d 43]; *People v. Williams* (1977) 75 Cal.App.3d 731, 737 [142 Cal.Rptr. 704]; *People v. Petruzo* (1910) 13 Cal.App. 569, 577 [110 P. 324]; *People v. Sidelinger* (1908) 9 Cal.App. 298, 299 [99 P. 390]; see also *People v. Allsip* (1969) 268 Cal.App.2d 830, 831-832 [74 Cal.Rptr. 550].) Accordingly, it concluded that reversal of McCoy's convictions compelled reversal of Lakey's convictions. Justice Hull disagreed. He argued that "[n]either law nor logic requires that an aider and abettor be afforded the benefit of a mitigating factor applicable only to the actual perpetrator to reduce a homicide from murder to manslaughter."

Resolution of this question requires a close examination of the nature of aiding and abetting liability. "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting

the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (Pen. Code, § 31; see *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122-1123 [77 Cal.Rptr.2d 428, 959 P.2d 735]; *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. (*Ibid.*) Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as "vicarious." (E.g., *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].) This description is accurate as far as it goes. But, as we explain, the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.

■ It is important to bear in mind that an aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Prettyman, supra*, 14 Cal.4th at p. 260.) Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. (*Id.* at p. 267.) ■ In this case, however, the trial court did not instruct the jury on the natural and probable consequences doctrine. It instructed only on an aider and abettor's guilt of the intended crimes. Accordingly, only an aider and abettor's guilt of the intended crime is relevant here. Nothing we say in this opinion necessarily applies to an aider and abettor's guilt of an unintended crime under the natural and probable consequences doctrine.

■ Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. (Pen. Code, § 20; see generally 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, §§ 1, 21, pp. 198-199, 227-228.) This principle applies to aiding and abetting liability as well as direct liability. An aider and abettor must do something *and* have a certain mental state.

We have described the mental state required of an aider and abettor as "different from the mental state necessary for conviction as the actual perpetrator." (*People v. Mendoza, supra*, 18 Cal.4th at p. 1122.) The difference, however, does not mean that the mental state of an aider and abettor is

less culpable than that of the actual perpetrator. On the contrary, outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator. "To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' ([*People v. Beeman* (1984) 35 Cal.3d 547,] 560 [199 Cal.Rptr. 60, 674 P.2d 1318], italics in original.) When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' (*Ibid.*)" (*People v. Prettyman, supra,* 14 Cal.4th at p. 259.)[1] What this means here, when the charged offense and the intended offense—murder or attempted murder—are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator.

▬▬ Aider and abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person "chooses to become a part of the criminal activity of another, she says in essence, 'your acts are my acts . . . .' " (Dressler, *Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem* (1985) 37 Hastings L.J. 91, 111, quoted in *People v. Prettyman, supra,* 14 Cal.4th at p. 259.) But that person's *own* acts are also her acts for which she is also liable. Moreover, that person's mental state is her own; she is liable for her mens rea, not the other person's.

As stated in another work by Professor Dressler, "many commentators have concluded that there is no conceptual obstacle to convicting a secondary party of a more serious offense than is proved against the primary party. As they reason, once it is proved that 'the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea.*' That is, although joint participants in a crime are tied to

---

[1]Our discussion in *People v. Croy, supra,* 41 Cal.3d at page 12, footnote 5, contained language that has caused some confusion: "It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury." This statement was part of a discussion of liability for an *unintended* crime under the natural and probable consequences doctrine. Our reference to the "target offense" should more accurately have been to the charged crime. When the charged crime and the intended crime are the same, i.e., when guilt is *not* predicated on the natural and probable consequences doctrine, the aider and abettor must, indeed, share the actual perpetrator's intent.

a 'single and common *actus reus,*' 'the individual *mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt . . . will necessarily be different as well.' " (Dressler, Understanding Criminal Law (2d ed. 1995) § 30.06[C], p. 450, fns. omitted.)

Professor Dressler explained how this concept operates with homicide. "An accomplice may be convicted of first-degree murder, even though the primary party is convicted of second-degree murder or of voluntary manslaughter. This outcome follows, for example, if the secondary party, premeditatedly, soberly and calmly, assists in a homicide, while the primary party kills unpremeditatedly, drunkenly, or in provocation. Likewise, it is possible for a primary party negligently to kill another (and, thus, be guilty of involuntary manslaughter), while the secondary party is guilty of murder, because he encouraged the primary actor's negligent conduct, with the intent that it result in the victim's death." (Dressler, Understanding Criminal Law, *supra,* § 30.06[C], p. 450.)[2]

As the majority below noted, some cases have broadly stated—without analysis—that an aider and abettor may not be guilty of a greater offense than the direct perpetrator. But even these cases are factually consistent with our conclusion. In *People v. Antick, supra,* 15 Cal.3d 79, we merely said that "neither the felony-murder doctrine nor the theory of vicarious liability may be used to hold a defendant guilty of murder solely because of the acts of an accomplice, if the accomplice himself could not have been found guilty of the same offense for such conduct." (*Id.* at p. 89.) As applied to its facts, the

---

[2]Although not articulating the principle quite the same as Professor Dressler, other commentators have reached similar conclusions regarding homicide. (Perkins & Boyce, Criminal Law (3d ed. 1982) Imputability, § 8, p. 762 ["If an innocent citizen is the subject of a murderous assault under such circumstances that he is privileged by law to defend himself by the use of deadly force, a bystander, who could not himself prevent the harm by milder measures, would incur no guilt by encouraging the one assailed to shoot in self-defense. But if there was no actual impending danger, although there appeared to be, the circumstances might well be such as to entitle the actual slayer to an excuse based upon a reasonable mistake of fact as to the necessity of using deadly force in self-defense, whereas one who counseled him to take this extreme measure might be found to have made no mistake but to have spoken with the deliberate and malicious purpose of causing the death of one known to him to be acting in the capacity of a 'practical' joker. If so, the instigator should be convicted of murder . . . ." (Fn. omitted.)]; 2 LaFave & Scott, Substantive Criminal Law (1986) Limits of Accomplice Liability, § 6.8(c), p. 160 ["[W]hat if *A* shot and killed *B* upon a reasonable but mistaken belief that such deadly force was necessary in his own defense[?] This is clearly a defense to *A,* but should accomplice *C,* who aids *A* without such a belief, thereby go free? If, as we are assuming, *C* gave aid with the intent that *A* kill *B,* it would seem that *C* should not escape liability. Just as an accomplice may not benefit from a principal's heat of passion so as to downgrade his own liability to voluntary manslaughter, it would seem equally true that the accomplice may not defend upon the basis of the principal's own beliefs." (Fns. omitted.)].)

statement was correct. *Antick* contained no evidence of a defense personal to the actual perpetrator. Comparable language in *People v. Allsip, supra,* 268 Cal.App.2d at pages 831-832, *People v. Petruzo, supra,* 13 Cal.App. at page 577, and *People v. Sidelinger, supra,* 9 Cal.App. at page 299, also appears correct on the facts, for none of those cases contained evidence of a defense personal to the direct perpetrator. Accordingly, none of these cases considered the question presented here.

■ The statement that an aider and abettor may not be guilty of a greater offense than the direct perpetrator, although sometimes true in individual cases, is not universally correct. Aider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator.

Moreover, the dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator. Although Lakey was liable for McCoy's actions, he was an actor too. He was in the car and shooting his own gun, although it so happened that McCoy fired the fatal shots. Moreover, Lakey's guilt for *attempted* murder might be based entirely on his own actions in shooting at the attempted murder victims. In another shooting case, one person might lure the victim into a trap while another fires the gun; in a stabbing case, one person might restrain the victim while the other does the stabbing. In either case, both participants would be direct perpetrators as well as aiders and abettors of the other. The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role.

The remaining case the majority below cited, *People v. Williams, supra,* 75 Cal.App.3d 731, although also stating generally that "an aider or abettor cannot be guilty of a greater offense than the principal offender" (*id.* at p. 737), supports our conclusion in its outcome and, to a large extent, analysis. In *Williams,* the appellant struggled with the victim over her own weapon, which was never fired. She appealed to her sister to shoot the victim, which the sister did, killing him. The sister was acquitted, but the appellant was convicted of murder. (*Id.* at p. 733.) The appellant argued on appeal that her

conviction was inconsistent with the acquittal of the actual shooter. The court disagreed. It found the jury "justified in finding that the appellant, with malice, caused the victim's death by using her sister as an innocent agent to accomplish the intended death of the victim. . . . [T]hrough her entreaty, she was the effective cause of the discharge of the firearm in her sister's hand. The fact that the sister was acquitted is of no comfort to appellant, because each acted under different circumstances." (*Id.* at pp. 733-734.)

In essence, the court in *People v. Williams, supra,* 75 Cal.App.3d 731, found the appellant had used an innocent agent, and was liable for that agent's action even though the agent was herself entirely innocent. We see no reason the outcome should be different if the actual killer was not entirely innocent but instead guilty of a lesser crime than the indirect actor. The same principles should apply whenever a person aids, or perhaps induces, another to kill, whether that other person is entirely innocent, as in *Williams,* or less culpable, as possibly here, or, potentially, more culpable. In any of these circumstances, each person's guilt would be based on the combined actus reus of the participants, but also solely on that person's own mens rea. Each person's level of guilt would " 'float free.' " (Dressler, Understanding Criminal Law, *supra,* § 30.06[C], p. 450.)

Our conclusion finds implied support in *People v. Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622]. There we held that collateral estoppel prohibited the trial of a person alleged to be vicariously liable for murder when the alleged direct perpetrator had previously been acquitted of the same murder. (See *People v. Palmer* (2001) 24 Cal.4th 856, 866 [103 Cal.Rptr.2d 13, 15 P.3d 234].) We distinguished other cases because in those cases "identity of the issue was lacking." (*People v. Taylor, supra,* 12 Cal.3d at p. 692.) As an example, we cited cases in which "the accomplice was acquitted because of the lack of a culpable mental state for reasons personal only to the accomplice . . . ." (*Id.* at p. 692, fn. 6.) We also noted that the direct perpetrator "did not offer a defense such as insanity, intoxication, or duress based on his personal lack of culpability irrespective of the criminality of his acts." (*Id.* at p. 697, fn. 13.) This language implies that if the direct perpetrator had been acquitted due to a defense personal to him, the aider and abettor, who had no such defense, might nonetheless have been guilty of the murder, i.e., have been guilty of a greater crime than the direct perpetrator.

As another example, assume someone, let us call him Iago, falsely tells another person, whom we will call Othello, that Othello's wife, Desdemona, was having an affair, hoping that Othello would kill her in a fit of jealousy. Othello does so without Iago's further involvement. In that case, depending

on the exact circumstances of the killing, Othello might be guilty of manslaughter, rather than murder, on a heat of passion theory. Othello's guilt of manslaughter, however, should not limit Iago's guilt if his own culpability were greater. Iago should be liable for his own acts as well Othello's, which he induced and encouraged. But Iago's criminal liability, as Othello's, would be based on his own personal mens rea. If, as our hypothetical suggests, Iago acted with malice, he would be guilty of murder even if Othello, who did the actual killing, was not.

We thus conclude that when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator.[3]

As applied here, Lakey and McCoy were to some extent both actual perpetrators and aiders and abettors. Both fired their handguns, although McCoy's gun inflicted the fatal wounds. Once the jury found, as it clearly did, that Lakey acted with the necessary mental state of an aider and abettor, it could find him liable for both his and McCoy's acts, without having to distinguish between them. But Lakey's guilt was also based on his own mental state, not McCoy's. McCoy's unreasonable self-defense theory was personal to him. A jury could reasonably have found that Lakey did not act under unreasonable self-defense even if McCoy did. Thus, his conviction of murder and attempted murder can stand, notwithstanding that on retrial McCoy might be convicted of a lesser crime or even acquitted.

As an independent basis for reversing Lakey's convictions, the majority below also concluded that, because the jury may have erroneously found McCoy acted with malice, it did not necessarily find that *any* participant acted with malice. This conclusion also reflects a misunderstanding about the mental state needed for an aider and abettor (again, aside from the natural and probable consequences doctrine not relevant here). The trial court instructed the jury both regarding direct perpetrator liability and aiding and abetting liability. It also instructed on the malice requirement of murder. To the extent the jury based its verdict as to Lakey on his personal acts, it necessarily found malice. To the extent it based it on McCoy's acts—finding that Lakey aided and abetted those acts—it necessarily found that Lakey knew of McCoy's unlawful purpose and intended to commit, encourage, or

---

[3]Because we cannot anticipate all possible nonhomicide crimes or circumstances, we express no view on whether or how these principles apply outside the homicide context. (See Dressler, Understanding Criminal Law, *supra*, § 30.06[C], pp. 450-451.)

facilitate that purpose. (See *People v. Beeman, supra,* 35 Cal.3d at p. 560.) The only unlawful purpose charged here was an unlawful killing. Absent some circumstance negating malice one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice. (See generally *People v. Whitfield* (1994) 7 Cal.4th 437, 450 [27 Cal.Rptr.2d 858, 868 P.2d 272].) Whether or not McCoy killed in unreasonable self-defense, thus negating what would otherwise be malice as to him, McCoy's unreasonable self-defense would not negate the implicit jury finding that Lakey knowingly and intentionally helped McCoy commit the crime, which constitutes malice.[4]

### III.  CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter for further proceedings consistent with our opinion. We also disapprove any interpretation of *People v. Antick, supra,* 15 Cal.3d 79; *People v. Williams, supra,* 75 Cal.App.3d 731; *People v. Allsip, supra,* 268 Cal.App.2d 830; *People v. Petruzo, supra,* 13 Cal.App. 569; and *People v. Sidelinger, supra,* 9 Cal.App. 298, that is inconsistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

Appellants' petition for a rehearing was denied August 22, 2001.

---

[4]In the Court of Appeal, Lakey also argued that the instructional error prejudiced him even without reference to McCoy. The court did not consider the question in light of its reversing the judgment on other grounds. It should do so on remand.